**SCHILLER, PITTENGER & GALVIN, P.C.**
K. Joseph Vyzas, Esq. (ID No. 005251979)
Kieran M. Dowling, Esq. (ID No. 123812014)
1771 Front Street
Scotch Plains, New Jersey 07076
(908) 490-0444
*Attorneys for Plaintiffs Astro Precision Tool &*
*Machine, LLC and Ronald E. Oringer*

| | |
|---|---|
| ASTRO PRECISION TOOL & MACHINE LLC, A NEW JERSEY LIMITED LIABILITY COMPANY and RONALD E. ORINGER, individually and in his official capacity as managing member of Astro Precision Tool & Machine LLC<br><br>Plaintiffs,<br><br>v.<br><br>ASTRO TOOL & MACHINE CO. INC, A NEW JERSEY CORPORATION, GARY PRICE, individually and in his official capacity as President of Astro Tool & Machine Co., JOHN DOES 1-10 and ABC CORPORATIONS 1-10,<br><br>Defendants. | **SUPERIOR COURT OF NEW JERSEY**<br>**LAW DIVISION: UNION COUNTY**<br>**Docket No.: UNN-L-**<br><br>**Civil Action**<br><br>**COMPLAINT** |

The Plaintiffs Astro Precision Tool & Machine, LLC ("Astro Precision") and Ronald E. Oringer ("Oringer"), individually and in his official capacity as managing member of Astro Precision ("Oringer" together with "Astro Precision", collectively referred to as "Plaintiffs"), by and through their attorneys, Schiller, Pittenger & Galvin, P.C., by way of Complaint against the Defendants Astro Tool & Machine Co. Inc. ("Astro Tool") and Gary Price ("Price"), individually and in his official capacity as President of Astro Tool ("Price", together with "Astro Tool", collectively referred to as "Defendants") allege as follows:

## JURISDICTION AND VENUE

1. This is an action in a case of actual controversy and is brought pursuant to Rule 4:3-1(a)(5) of the *Rules Governing the Courts of the State of New Jersey* to recover for monetary damages incurred by Plaintiffs as a result of Defendants' unlawful and fraudulent conduct.

2. Venue is proper in this County pursuant to Rules 4:3-2 of the *Rules Governing the Courts of the State of New Jersey*, inasmuch as certain parties resided in this County at the time the claims alleged herein arose, and the claims arose in this County.

## THE PARTIES

3. At all relevant times, Astro Precision with an address of 810 Martin Street, Rahway, New Jersey 07065, purchased the assets, good will and real estate of Astro Tool on or about February 22, 2024.

4. At all relevant times, Oringer, with an address of 31 Indigo Road in Hacketsttown, New Jersey 07840, is the Managing Member of Astro Precision.

5. At all relevant times, Astro Tool, with an address of 810 Martin Street, Rahway, New Jersey 07065, operated a precision machine shop that manufactures parts for various industries. Astro Tool maintained that operation with approximately twenty (20) employees.

6. At all relevant times, Astro Tool represented that a large portion of its revenue was derived from the manufacturing and sale of various machine parts that are utilized in the manufacturing of aluminum soda and beer cans. This included the production of Rams, rollers, inner housings, and shafts to companies that manufacture cans. A Ram is a reciprocating piston that runs back and forth as part of the canning machinery process.

7. At all relevant times, Price, with an address of 960 Glenwood Avenue, Plainfield, New Jersey 07060 was the owner and President of Astro Tool.

2

8. At all relevant times, Stolle Machinery Co. LLC ("Stolle") is believed to be a Colorado limited liability company, with an address of 6949 S Potomac St., Centennial, Colorado 80112. Stolle designs and builds beverage can lines, beverage end lines, food can lines, food end lines, aerosol can lines, and lines and machines for other drawn containers or products.

9. At all relevant times, Stolle was Astro Tool's largest customer and largest purchaser of Rams.

10. At all relevant times, Robert D'Antonio ("D'Antonio"), with an address of 6949 S Potomac St., Centennial, Colorado 80112, was Stolle's Director of Global Procurement.

11. At all relevant times, Bennet Heat Treating and Brazing Co. ("Bennett"), with an address of 690 Ferry Street, Newark, New Jersey 07106, is in the business of metallurgically processing materials to increase their properties from their annealed state so companies, such as Astro Tool, can machine them and make their products, including Rams, more hardened and wear resistant. Astro Tool maintained a working relationship with Bennett to heat treat its manufactured rams. Over the years, Astro Tool and Bennett had worked together to perfect the production of rams that were wear resistant and maintained longevity.

12. At all relevant times, John Quaglia ("Quaglia"), with an address of 690 Ferry Street, Newark, New Jersey 07106, was the President of Bennett.

13. At all relevant times, Steve Klawunn ("Klawunn"), with an address of 810 Martin Street, Rahway, New Jersey 07065 was the foreman of Astro Tool for forty-eight (48) years with intricate knowledge of the production process for Astro Tool's products, including Rams. He kept track of orders for various products. He is now the foreman of Astro Precision.

**FACTS COMMON TO ALL COUNTS**

14. In or about July of 2023, Price was contacted by representatives of Stolle.

15. In or about that time, Stolle informed Price that it would be manufacturing Rams in house and would no longer be placing orders for Rams with Astro Tool, which had previously manufactured the Rams for Stolle.

16. At that time, Price knew that Stolle's orders with Astro Tool for Rams would decrease dramatically.

17. In or about July of 2023, Price contacted the Michael Lefkowitz ("Lefkowitz") of The Benjamin Ross Group, LLC (the "BR Group"), a business brokerage company, to list Astro Tool, its assets, good will, and real estate for sale.

18. On August 21, 2023, Oringer received an email from Lefkowitz of the BR Group with a Confidential Information Memorandum ("CIM") for Astro Tool, describing Astro Tool as a fifty (50)-year old manufacturing business "with increasing revenue." In that email, Lefkowitz noted that Astro Tool would be going on the market shortly.

19. Price provided the BR Group with information about Astro Tool's business to be included in the CIM.

20. The CIM reported:

> This business has been pre-approved for an SBA (Small Business Administration) loan. A new owner would have to invest $197,000 as a down payment, and based on historical data, would make $345,000 in the first year after paying back the loan. The bank financing includes a line of credit which can be used as working capital. Real estate also available.
>
> . . .
>
> A large portion of Astro's revenue comes from the manufacture and sale of machine parts which are utilized in the manufacturing of aluminum soda and beer cans, Astro makes hundreds of different parts for the can industry and caters to the niche. Astro has produced equipment in this segment since the early 1970s and has acquired proprietary knowledge. Because of this, Astro can manufacture these products at prices which have created barriers to entry to

4

competitors. Products produced for the aluminum can industry account for approximately 80% of the revenue of Astro.

. . .

The remainder of the products manufactured by Astro are in different industries such as manufacturing shafts for submarines.. They also have another line of products which are manufactured utilizing their water jet equipment. This product line is used for panels for industrial cabinets, architectural work and various other items.

21.     The CIM reported that Astro Tool's customer orders range from $200.00 to $40,000.00 with an average of eighty (80) jobs per month.

22.     The CIM represented that one (1) customer in the aluminum can industry amounted to 50% of Astro Tool's revenue and had been Astro Tool's customer for forty-five (45) years.

23.     The CIM represented that "the business spends zero dollars each year on advertising. All of the business comes from word of mouth and repeat customers."

24.     The customer the CIM referenced in paragraph 22 above was Stolle.

25.     Astro Tool was housed in an approximately 18,000 square foot building located at 810 Martin Street in Rahway, New Jersey 07065. The CIM listed the real estate as part of the sale for $2,000,00.00. The price of the business was listed at $1,900,000.00. The total purchase price for Astro Tool's business and real estate was $3,900,000.00.

26.     In or about late August or early September of 2023, Quaglia of Bennet received a call from Stolle's representative D'Antonio, asking him if Bennett would be willing to perform Stolle's heat treating processes directly.

27.     Quaglia did not provide an answer, but was concerned because Stolle's offer indicated that Stolle had begun or would be producing canning machine parts, including Rams, in house. Given his loyalty to Astro Tool and his company's decades-long relationship with Astro

5

Tool of heat treating their manufactured products, Quaglia became concerned about the future of Bennett's revenue stream and informed Price of Stolle's offer.

28.     In response, Price indicated to Quaglia that he too had been approached by Stolle about a change in Astro Tool's business relationship with their company.

29.     On August 22, 2023, D'Antonio, Stolle's Director of Global Procurement, documented in a letter that Stolle had prior conversations with Price about visiting Stolle in Denver. The email to Price and Quaglia of Bennet read:

> Gary and John good morning, per our conversations about visiting Denver. Can you please check your schedule, for the Monday 10/2 to arrive in Denver, we will meet on Tuesday 10/3 visit the different Stolle facilities. Then we can have dinner and you can fly back on Wednesday 10/4.

30.     During the week of September 26, 2023, Quaglia met with Price for lunch to discuss the upcoming meeting at Stolle.

31.     Their discussion covered what information they would and would not disclose to Stolle regarding the heat treating and Ram making processes.

32.     During this lunch, Price disclosed to Quaglia for the first time that Stolle's representatives informed him that Stolle would be manufacturing Rams in house at a high volume and only sending Astro Tool orders for rebuild and replacement Rams and other parts on an as-needed basis. Stolle would be sending Astro Tool orders for the more difficult parts to manufacture (such as Rams for an outdated canning machines) so as to not to disrupt their own production process.

33.     Price expressed to Quaglia hope that Stolle would eventually come back to Astro Tool if they did not provide all of their proprietary information and methodology for producing Rams during the October 3, 2023, meeting.

6

34.     Quaglia expressed concern to Price that both Bennett and Astro Tool would lose a significant amount of business.

35.     Price responded that he would make up the lost business by selling Rams, which Bennett had heat treated, directly to consumers. Price represented that he could sell after-market Rams to consumers at a greater markup, and bypass Stolle and other machine manufacturers in the chain of sale.

36.     Price's representations to Quaglia were knowingly false.

37.     After this conversation, Price and Quaglia never met with any consumers to solicit business or contract for the direct sale of heat treated Rams.

38.     At no point during this conversation did Price advise Quaglia that he had listed Astro Tool for sale and would be getting out of the business.

39.     Price never told Quaglia he had sold the business until July of 2024.

40.     Before leaving for Colorado, Price conveyed to his foreman Klawunn that the meeting with Stolle was routine, and merely an opportunity for Stolle to meet with its vendors, discuss their future business relationships, and address any issues Stolle had. To Klawunn, Price indicated the meeting was, for all intents and purposes, a Stolle performance review.

41.     In anticipation of their October 3, 2023, Denver meeting, on September 28, 2023, D'Antonio sent Quaglia and Price the agenda. The agenda's 11:00 a.m.-1:30 p.m. time slot included "working lunch to discuss Stolle forecast, future Ram production and heat treat discussion."

42.     At this meeting Stolle discussed and showcased its plan for producing Rams in house, discussed its company's forecast, and future Ram production and heat treating.

43. At the meeting, D'Antonio and Stolle's representatives gave Price and Quaglia a tour of their manufacturing assembly floor for its canning machines. The manufacturing plant and its machines were massive and impressive.

44. The plant's Ram production set up was nearly identical to Astro Tool's manufacturing plant set up, including both its grinding and machining segments.

45. Following the tour and over lunch, Stolle's representatives conveyed to Quaglia and Price that COVID caused consumers to switch to drinking out of cans for sanitary reasons. The demand for cans had sky rocketed, and Stolle's can-producing customers required new and additional canning machines. However, when businesses, including restaurants and bars reopened, the demand for canned products fell along with canning machinery. The market for canning machines was oversaturated with new canning machines Stolle's customers no longer needed. Stolle was pivoting into the making of canning machine parts, including Rams, itself.

46. Stolle's meeting confirmed to Astro Tool that it would be losing its book of business. While Quaglia remained concerned, Price surprisingly remained calm through the ordeal.

47. Approximately one (1) week after the Colorado meeting, D'Antonio called Quaglia again attempting to entice Bennett to perform Stolle's heat treating needs directly. Based on his loyalty to Astro Tool and for business reasons, Quaglia declined.

48. Meanwhile, Oringer had no knowledge of Price's October 3, 2024, meeting with Stolle, and Price never disclosed it to Oringer.

49. Relying upon Price's representations contained in the CIM, Oringer expressed interest in purchasing Astro Tool.

50.    October 9, 2023, Oringer and Price executed a Letter of Intent ("LOI") to purchase Astro Tool's business and real estate for $3,900,000.00.

51.    Oringer exercised his due diligence and reviewed Astro Tool's books and records through September 30, 2023. The books and records presented by Astro Tool to Oringer reflected the income for that period.

52.    On November 9, 2023, the agreed upon due diligence period concluded and Oringer was satisfied that the records produced by or on behalf of Astro Tool matched the tax returns and other previously provided financial materials.

53.    During this due diligence period, Oringer was not provided with an Astro Tool's customer list or the breakdown of manufactured parts (including Rams) purchased by each customer, including Stolle.

54.    Oringer was presented with gross sales figures per month for each product, including Rams.

55.    Oringer was prohibited from contacting any of Astro Tool's customers.

56.    There is a twelve (12)-week lead time between the date Astro Tool's customers (particularly Stolle) places an order for Rams and the date they are shipped. The production, drilling, machining and heat treating process takes several weeks.

57.    In the normal course of its business, Astro Tool recorded its Ram sales on the day they shipped the products to their customers.

58.    In October of 2023, Astro Tool's Ram sales orders to Stolle began to drop significantly. Klawunn and other Astro Tool employees noticed this staggering decrease.

59.    When Astro Tool's foreman Klawunn questioned Price what he had learned from Stolle during their October 3, 2023 meeting and why the number of Ram orders had dropped

9

significantly, Price responded that Stolle facing "slow supply chain issues," and they overbooked during the pandemic.

60.     Price's representations were half-truths, because he omitted any reference to Stolle's high volume Ram production.

61.     Klawunn addressed the issue with Price every two (2) to three (3) weeks thereafter. Each time Price would provide a new excuse for the significant drop in Ram orders from Stolle, including but not limited to "the economy," "people overbought", and "interests rates were up," so it was more expensive to take loans for the machinery.

62.     Klawunn knew that Stolle had attempted to produce its own Rams in the past, and Price conveyed to him that at the October 3, 2023 meeting Stolle had expressed interest in retaining Bennett's heat treating services.

63.     Still, Price unequivocally represented to Klawunn that there was no indication that Stolle would not be buying Rams from Astro Tool in the same volume going forward.

64.     Price reassured Klawunn and employees that Stolle would come back, given that Astro Tool had perfected the high labor task and specific technical proficiency in the manufacture of reliable Rams.

65.     Sometime in January 2024, and prior to the closing for the purchase of Astro Tool's business and real estate, Oringer asked Astro Tool to provide updated financial information to confirm that there were no changes in the financial condition of Astro Tool through the 2023 year end.

66.     On February 2, 2024 Lefkowitz of the BR Group, Astro Tool's broker, sent the following email to Oringer with a glowing update as to the financial condition of Astro Tool:

Attached is the 2023 pnl from the accountant. The

10

> top line was down 0.06%. The recasted profit is
> 756,000 with paying rent. With you purchasing the
> building the recasted SDE is 909,000.

Lefkowitz noted that through the revenues were down by 0.06%, the recasted profit for the year was up.

67. Having reviewed the tax returns and financial materials provided by or on behalf of Astro Tool, Oringer made an offer to purchase Astro Tool's business and real estate for the full asking price of $3,900,000 not knowing that in or about July 2023, and during the due diligence period, Astro Tool was informed by Stolle, its largest customer and its largest Ram purchaser, that it would be manufacturing Rams in house and would no longer be using Astro Tool in manufacturing of said Rams.

68. On or about February 2024 Oringer and Price entered into an Asset Purchase Agreement (the "APA") to purchase Astro Tool's business for $1,900,000 allocated at $1,000,000 for the assets and $900,000 for the Goodwill. Additionally, on that same date, Oringer and Price entered into a Personal Goodwill Purchase and Sale Agreement for $900,000. Further on the same date, Oringer and Price entered into a Purchase and Sale Agreement for the fee simple interest in the real property commonly known as 810 Martin Street in Rahway, New Jersey 07065, improvements, the personal property, the service contracts, the building warranties for $2,000,000.00.

69. Under the pertinent provisions of APA, Paragraph 11(A) of the APA describe Astro Tool's obligations under the APA as follows:

> Buyers' obligations under this Agreement are subject to the satisfaction at or before the Closing Date of each of the following conditions (the fulfillment of any of which may be waived in writing by Buyer):
>
> .......

11

      (ii)     **All representations, warranties, disclosures and statements of Seller contained in this Agreement are true and complete in all material respects as of the Closing Date** (Emphasis supplied)

      (iii)     **From the Effective Date until the Closing Date, there will not have been any material adverse change in Seller's Business, its condition or prospects (financial or otherwise) and there shall have been no material loss or damage to the Assets, whether or not such loss is insured.** (Emphasis supplied)

70.    At no point did Price or any representative of Astro Tool convey to Oringer that Stolle had substantially reduced its purchase of Rams from Astro Tool and intended to manufacture its own canning machine parts, including Rams at high volume, in house, which would, in turn, reduce Astro Tools' sales revenue dramatically.

71.    Price never told Oringer that Astro Tool's sales dropped dramatically beginning in November 2023 (more than three (3) months before the February 22, 2024 closing).

72.    On February 22, 2024, Oringer and Astro Precision closed on the purchase of Astro Tool's business, its assets, and its real estate.

73.    For the months of March, April, and May of 2024, Oringer was consumed with learning and operating the business. To assist him in training and the transition of ownership, Oringer hired Price on a full time basis for the first eight (8) weeks. This was done pursuant to the APA. Oringer and Price agreed to extend this period.

74.    A cursory review by Oringer showed that Astro Precision's gross sales for March, April and May 2024 appeared to be on par (approximately $327,000.00, $284,000.00 and $336,000.00 respectively) with the prior year's sales provided by Astro Tool.

75.    In the spring of 2024, Price represented to Oringer that Stolle's sales of new canning equipment and machinery to its customers had slowed, thus causing its orders from Stolle to slow as well.

12

76.     Price represented to Oringer that the sales would bounce back.

77.     At no point did Price tell Oringer that Stolle's orders from Astro Precision had decreased because Stolle was now making Rams in house.

78.     Oringer relied upon Price's misrepresentations that this was a blip in the ebb and flow of the market.

79.     Astro Precision records sales on the day the product is shipped to the customer. During Oringer's eight (8)-week training period, Price instructed Oringer to record a number of larger volume sales that had not yet shipped as sales already completed on the last day of the month.

80.     This was not correct from an accounting perspective.

81.     Given that Oringer was still learning the business at Price's instruction, who owned the business for decades, Oringer followed Price's instruction. This artificially inflated the March, April and May 2024 sales, covering up the sales shortfalls.

82.     In June of 2024, however, Oringer realized there was a serious problem with the business when gross sales plummeted to approximately $190,000.00.

83.     In August 2024 and after the closing on the purchase of Astro Tool's business, Oringer reviewed the sale records of Astro Tool recorded as of February 21, 2024, the day prior to the business closing Oringer noted that sales were recorded as having occurred pre-closing despite the fact that the products were actually shipped post-closing in February and March 2024. This caused $52,845 of sales to be recorded pre-closing for products that had not yet been shipped. These sales belonged to Astro Precision not Astro Tool. The amount was eventually repaid to Astro Tool on September 26, 2024.

13

84.    During the week of July 23, 2024, Oringer, who was now concerned, met with Price to discuss the decrease in sales revenue and to discuss the forecasted July and August sales.  In response Price suggested seeking out new foreign customers for the sale of Rams.

85.    In response, Oringer investigated the sale of Rams to Stolle.

86.    In July of 2024, Oringer discovered that the Astro Precision Ram sales to Stolle were almost non-existent.  However, machinery parts that are used to manufacture Ram Assemblies (i.e. the component pieces to  complete the Rams) were still being purchased by Stolle.

87.    The business records reflected that Astro Tool had averaged the sale of just under thirty (30) rams per month to Stolle through October 2023.

88.    By November of 2023, the number of Rams sold to Stolle dropped to ten (10).

89.    By December of 2023, the number of Rams sold to Stolle dropped to seven (7).

90.    By January of 2024, the number of Rams sold to Stolle dropped to zero (0).

91.    In February of 2024, the company sold only four (4) Rams to Stolle.

92.    In March of 2024, the company sold no Rams to Stolle.

93.    In April and May of 2024, the company sold only four (4) Rams to Stolle.

94.    In June of 2024, the company sold only three (3) Rams to Stolle.

95.    In July of 2024, the company had sold no Rams to Stolle.

96.    At this point, Oringer realized that Stolle was manufacturing Rams themselves.

97.    Price had never told Oringer that was, in fact, occurring.

98.    In 2023, Astro Tool completed $1,260,404.00 in Ram sales to Stolle.

99.    In January and February of 2024, Astro Tool completed only $17,361.00 in Ram sales to Stolle.

14

100. From February of 2024, to July of 2024, Astro Precision had completed only $67,886.00 in Ram sales to Stolle.

101. Through July of 2024, Astro Tool and Astro Precision combined had completed a mere $89,247.00 in Ram sales to Stolle.

102. In light of the twelve (12)-week lead time between orders placed and sold, Stolle began scaling back the number of purchased Rams in October of 2023.

103. In July of 2024, Quaglia received an email from Price introducing him to Oringer. When Quaglia called him to ask "Who's Ron?" Price responded that he was the new owner of Astro Tool.

104. On July 24, 2024, Price emailed Ian Ramsundar ("Ramsundar") and Quaglia of Bennett stating, "I would like to come down to Bennett with Ron Oringer and make an official introduction, let him see your facilities and heat treat procedures. The best days would be Monday or Wednesday mornings but can make ourselves available anytime."

105. On July 30, 2024, Oringer met with Price to discuss the staggering drop off in the number of Rams purchased by Stolle and the material change in Astro Precision sales revenue. Oringer presented the Stolle sales numbers to Price, advising him that a material reduction in sales of his largest customer should have been reported to him before the closing and he had a responsibility to disclose this to him.

106. That day, Price called Quaglia about the meeting at Bennett to take place the next day. During the call, Price pleaded with Quaglia, no uncertain terms, to "NOT BRING UP ANYTHING ABOUT THE MEETING WITH STOLLE UNLESS ASKED."

107. When Oringer stated his belief that Stolle might be manufacturing Rams themselves, given the staggering drop off in sales, and that this was not a temporary reduction in

15

Ram purchases but a permanent one, Price responded "Do you have proof?" and "Did Stolle tell you this?"

108. Oringer responded that it did not matter whether the adverse change was permanent or temporary, since Price was still required to disclose this adverse change to him before the closing occurred. Price then stormed out of the meeting and advised that any further discussions would have to be through attorneys.

109. Oringer then ended Price's employment.

110. Price knew that Stolle, its largest customer and largest Ram purchaser would stop purchasing the largest volume and highest profit margin product that Astro Precision produced.

111. Price knowingly and intentionally kept this information from Oringer.

112. Price knew this information would have a major impact on the business of Astro Precision and on its employees.

113. Oringer never would have purchased Astro Tool or its real property had he known that Stolle was planning to stop purchasing Rams from Astro Tool.

114. Later the morning of July 30, 2024, Oringer emailed Price and advised him that he had failed to inform him of the adverse material change to Astro Tool's business prior to closing on its purchase of the business and the real estate of Astro Tool and that he was obligated to do so. Price should have disclosed to Oringer that there was a material reduction in sales from Stolle, its largest customer and its largest purchaser of manufactured Rams.

115. That afternoon, Oringer informed Kristy Soto ("Soto"), Astro Precision's Office Manager of what Price has said. Oringer and Soto then advised Klawunn, the plant foreman, of the most recent conversation with Price.

116.    Shortly thereafter, Oringer found email communications on Astro Tool's server discussing the October 3, 2023, meeting at Stolle and the planned agenda for the meeting.

117.    The following day, July 31, 2024, Oringer and Klawunn met with Quaglia and Ramsunder of Bennett at Bennett's facility to address current and future operations in light of Stolle's decision to make Rams in house.  Price was supposed to attend this meeting but did not.

118.    Klawunn brought up the October 3, 2023 Stolle visit and Quaglia shared that he attended the October 3, 2023, meeting at Stolle location, where Stolle advised that it would be manufacturing Rams in house which had been previously made by Astro Tool.

119.    According to Quaglia, Stolle advised that it had invested heavily into its Ram production plant, would be producing them in quantity, and would only be submitting orders to Astro Tool and Bennet for those Rams that it could not manufacture in a timely manner, or, stated otherwise, account for its overflow orders.

120.    Quaglia confirmed that at this meeting Stolle's representatives advised that it would be manufacturing Rams at its facility and would no longer be purchasing Rams from Astro Tool in volume.

## COUNT ONE
### (Breach of Contract)

121.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if set forth at length herein.

122.    Pursuant to the Contract, Plaintiffs agreed to pay Defendants for the purchase of the assets, good will, and real estate of Astro Tool.

123.    Plaintiffs have, at all times, performed all stipulations, conditions, and obligations under said Contract and have done so in the manner specified therein, while Defendants have failed and/or refused to satisfy their obligations under said Contract.

17

124. Therefore, Defendants have breached their obligations under the Contract.

125. Defendants' breach of said Contract is material and goes to the essence of the Contract.

126. As a direct and proximate cause of Defendants' breach, Plaintiffs have been and will continue to be harmed.

**WHEREFORE**, Plaintiffs Astro Precision Tool & Machine Co, LLC and Ronald E Oringer demand judgment against Defendants Astro Tool & Machine Co., Inc. and Gary Price, jointly and severally, as follows:

(a)    Compensatory damages;

(b)    Pre-Judgment and post-judgment interest;

(c)    Attorney's fees and costs of suit; and

(d)    Any and all further relief which the Court deems equitable and just.

### COUNT TWO
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

127. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if set forth at length herein.

128. In every agreement between parties, there is an implied covenant imposed upon both parties to deal in good faith and fairly and to not frustrate the other party's expectations of benefits under the contract.

129. Plaintiffs performed under the terms of the Contract.

130. By failing to advise Plaintiffs that there was a material adverse change in Defendants' business prior to the closing on the purchase of its business and real estate as it was obligated to do so under the terms of the Asset Purchase Agreement, Defendants have frustrated Plaintiffs' expectations of benefits under the Contract.

18

131.    Specifically, Defendants should have advised Plaintiffs that its largest customer and its largest purchaser of manufactured Rams would be manufacturing Rams in house, resulting in a substantial reduction in Defendants business.

132.    As a result, Defendants have breached the implied covenant of good faith and fair dealing.

133.    As a direct and proximate result of Defendants' breach, Plaintiffs have been and will continue to be harmed.

**WHEREFORE**, Plaintiffs Astro Precision Tool & Machine Co., LLC and Ronald E. Oringer demand judgment against Defendants Astro Tool & Machine Co., Inc. and Gary Price, jointly and severally as follows:

(a)    Compensatory damages;

(b)    Pre-judgment and post-judgment interest;

(c)    Attorney's fees and costs of suit; and

(d)    Any and all further relief which the Court deems equitable and just.

## COUNT THREE
### (Fraud)

134.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if set forth at length herein.

135.    Defendants knowingly made several material misrepresentations and omissions to Plaintiffs, including, but not limited to:

(a)    Sometime in July 2023, Defendants were informed by its largest customer and its largest purchaser of manufactured Rams that it would be manufacturing canning machine

parts, including Rams in house and would no longer be placing orders including Rams with Defendants.

(b)     At that time, Defendants knew that its revenue would be dramatically decreased.

(c)     On or about February 2, 2024, Defendants' representative, Lefkowitz of the BR Group, emailed a Profit and Loss Statement for 2023 provided by Defendants' accountants to Plaintiffs and noted that although the revenues were lower by 0.06%, the recast profit for the year was up. Defendants', through their representative, fails to disclose that its revenue would be dramatically decreased as a result of the loss of the Stolle business.

(d)     In August 2024, after its purchase of Defendants' business and real estate, Plaintiff's reviewed Astro Tool's records of the sales recorded as of February 21, 2024, the day prior to the closing of its purchase of Defendants' business and real estate. Defendant had recorded sales pre-closing for items actually shipped post-closing in February and  March April of 2024, contrary to standard accounting practices.  This resulted in sales of $52,845.00 to be recorded pre-closing for products that had not yet been shipped. The sales belonged to Plaintiffs and on September 24, 2024, Defendants repaid Plaintiffs the amount of $52,845.00.

(e)     Sometime in the Spring of 2024, Oringer noted that the sales of canning equipment, including rams, to Stolle had slowed. Oringer discussed these reduced sales with Price who had been hired as a consultant to Defendants to aid in the business transition as allowed by the Asset Purchase Agreement. Price represented to Oringer that the sales would "bounce back", that this was part of the "ebb and flow" of the business, and he suggested that Oringer seek foreign customers for the Rams. Defendants failed to disclose that sometime in July of 2023, prior to Plaintiffs' purchase of Defendants' business and real estate, that Stolle would be manufacturing canning machine parts, including rams in house and would no longer be placing such orders with Plaintiffs.

136.    The representations by Defendants to Plaintiffs are now, and when made, false, and Defendants knew them to be false at the time they were made.

137.    Defendants intended to induce Plaintiffs to purchase its business and real estate for the sum of $3,900,000.00.

138.   Plaintiffs agreed to purchase its business and real estate for the sum of $3,900,000.00 in reliance upon the aforementioned false representations and material omissions by Defendants.

139.   Upon entering into the Asset Purchase Agreement for the Business, the Personal Goodwill Purchase and Sale Agreement and the Purchase and Sale Agreement for Real Estate, Plaintiffs were not aware of the falsity in Defendants' representations, reasonably believed said representations to be true, and could not have discovered their falsity beyond the exercise of reasonable diligence.

140.   But for Defendants' aforementioned false representations and material omissions, Plaintiffs never would have purchased its business and real estate for the sum of $3,900,000.00.

141.   Defendants actually and proximately caused Plaintiffs harm as a result of Plaintiffs' reasonable reliance upon Defendants' misrepresentations and material omissions.

**WHEREFORE**, Plaintiffs Astro Precision Tool & Machine Co., LLC and Ronald E. Oringer demand judgment against Defendants Astro Tool & Machine Co., Inc. and Gary Price, jointly and severally as follows:

(a)   Compensatory damages;

(b)   Pre-judgment and post-judgment;

(c)   Punitive damages;

(d)   Attorney's fees and costs of suit; and

(e)   Any and all further relief which the Court deems equitable and just.

## COUNT FOUR
### (Negligent Misrepresentation)

143. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if set forth at length herein.

144. Defendants knowingly made several material misrepresentations and omissions to Plaintiffs, including, but not limited to:

(a) Sometime in July 2023, Defendants were informed by its largest customer and its largest purchaser of manufactured Rams that it would be manufacturing canning machine parts, including Rams in house and would no longer be placing orders including Rams with Defendants.

(b) At that time, Defendants knew that its revenue would be dramatically decreased.

(c) On or about February 2, 2024, Defendants' representative, Lefkowitz of the BR Group, emailed a Profit and Loss Statement for 2023 provided by Defendants' accountants to Plaintiffs and noted that although the revenues were lower by 0.06%, the recast profit for the year was up. Defendants', through their representative, fails to disclose that its revenue would be dramatically decreased as a result of the loss of the Stolle business.

(d) In August 2024, after its purchase of Defendants' business and real estate, Plaintiff's reviewed Astro Tool's records of the sales recorded as of February 21, 2024, the day prior to the closing of its purchase of Defendants' business and real estate. Defendant had recorded sales pre-closing for items actually shipped post-closing in February and March of 2024, contrary to standard accounting practices.  This resulted in sales of $52,845.00 to be

22

recorded pre-closing for products that had not yet been shipped. The sales belonged to Plaintiffs and on September 24, 2024, Defendants repaid Plaintiffs the amount of $52,845.00.

(e)     Sometime in the Spring of 2024, Oringer noted that the sales of canning equipment, including rams, to Stolle had slowed. Oringer discussed these reduced sales with Price who had been hired as a consultant to Defendants to aid in the business transition as allowed by the Asset Purchase Agreement. Price represented to Oringer that the sales would "bounce back", that this was part of the "ebb and flow" of the business, and he suggested that Oringer seek foreign customers for the rams. Defendants failed to disclose that sometime in July of 2023, prior to Plaintiffs' purchase of Defendants' business and real estate, Stolle would be manufacturing canning machine parts, including rams in house and would no longer be placing such orders with Plaintiff.

145.    The representations by Defendants to Plaintiffs are now, and when made, false, and Defendants knew or should have known them to be false at the time they were made.

146.    Defendants intended to induce Plaintiffs to purchase its business and real estate for the sum of $3,900,000.00.

147.    Plaintiffs agreed to purchase its business and real estate for the sum of $3,900,000.00 in reliance upon the aforementioned false representations and material omissions by Defendants.

148.    Upon entering into the Asset Purchase Agreement for the Business, the Personal Goodwill Purchase and Sale Agreement and the Purchase and Sale Agreement for Real Estate, Plaintiffs were not aware of the falsity in Defendants' representations, reasonably believed said

23

representations to be true, and could not have discovered their falsity beyond the exercise of reasonable diligence.

149. But for Defendants' intentional and/or neglect representations and material omissions, Plaintiffs never would have purchased its business and real estate for the sum of $3,900,000.00.

150. Defendants actually and proximately caused Plaintiffs harm as a result of Plaintiffs' reasonable reliance upon Defendants' intentional and/or negligent misrepresentations and material omissions.

**WHEREFORE**, Plaintiffs Astro Precision Tool & Machine Co., LLC and Ronald E Oringer demand judgment against Defendants Astro Tool & Machine Co., Inc. and Gary Price, jointly and severally as follows:

(a) Compensatory damages;

(b) Pre-judgment and post-judgment;

(c) Punitive damages;

(d) Attorney's fees and costs of suit; and

(e) Any and all further relief which the Court deems equitable and just.

**SCHILLER, PITTENGER & GALVIN, P.C.**
*Attorneys for Plaintiffs Astro Precision Tool & Machine, LLC and Ronald E. Oringer*

By:___S/Kieran M. Dowling_____
Kieran M. Dowling, Esq.

Dated: October 16, 2024

24

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Kieran M. Dowling, Esq. and K. Joseph Vyzas, Esq. are hereby designated as trial counsel for Plaintiffs.

**SCHILLER, PITTENGER & GALVIN, P.C.**
*Attorneys for Plaintiffs Astro Precision Tool and Machine, LLC and Ronald E. Oringer*

By:   S/Kieran M. Dowling, Esq.
       Kieran M. Dowling, Esq.

Dated: October 16, 2024

## RULE 1:4-8 CERTIFICATION

I certify that Complaint was filed in compliance with Rule 1:4-8(a). I am aware that I have a continuing obligation under Rule 1:4-8 to amend this certification if a reasonable opportunity for further investigation or discovery indicates insufficient support for any factual assertions proffered by Plaintiffs in any court filing or documents in this case.

By:   S/Kieran M. Dowling, Esq.
       Kieran M. Dowling, Esq.

Dated: October 16, 2024

## RULE 4:5-1(b)(3) CERTIFICATION

The undersigned hereby certifies that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

By:   S/Kieran M. Dowling, Esq.
       Kieran M. Dowling, Esq.

Dated: October 16, 2024

25

## RESERVATIONS OF RIGHTS

Plaintiffs reserve the right to file second specific amendments and/or additional claims as are applicable hereafter to this action or as subsequently discovered.

## RULE 4:5-1(b)(2) CERTIFICATION

Pursuant to Rule 4:5-1, I hereby certify that the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding, and no other action or arbitration is contemplated.

Furthermore, I hereby certify that I am not aware of any other parties who are non-parties who should be joined in this action.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By:  S/Kieran M. Dowling, Esq._____
      Kieran M. Dowling, Esq.

Dated: October 16, 2024

# Civil Case Information Statement

## Case Details: UNION | Civil Part Docket# L-003857-24

**Case Caption:** ASTRO PRECISION TOOL & MACHIN VS ASTRO TOOL & M

**Case Initiation Date:** 10/18/2024

**Attorney Name:** K JOSEPH VYZAS

**Firm Name:** SCHILLER PITTENGER & GALVIN, PC

**Address:** 1771 FRONT ST STE D
SCOTCH PLAINS NJ 070760000

**Phone:** 9084900444

**Name of Party:** PLAINTIFF : Astro Precision Tool & Machine

**Name of Defendant's Primary Insurance Company**

(if known): None

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Astro Precision Tool & Machine?** NO

**Are sexual abuse claims alleged by: Ronald E Oringer?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO  **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

10/18/2024                                                      /s/ K JOSEPH VYZAS
Dated                                                                    Signed